UNITED STATES of America, Appellee,

v.

**Nazira A. GOMES, Defendant, Appellant.**

**No. 91–1171.**

United States Court of Appeals, First Circuit.

Heard April 9, 1992.

Decided July 15, 1992.

---

Charles P. McGinty, Boston, Mass., for defendant, appellant.

Stephen A. Higginson, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for U.S.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and YOUNG,* District Judge.

SELYA, Circuit Judge.

Defendant-appellant Nazira A. Gomes was found guilty of possessing counterfeit social security cards with intent to purvey them.[1] In this appeal, she asserts *inter alia* that the district court should have

---

* Of the District of Massachusetts, sitting by designation.

1. The statute of conviction provides in relevant part:

Whoever ... knowingly possesses a ... counterfeit social security card with intent to sell ... shall be guilty of a felony....

42 U.S.C. § 408(g)(3) (1988) (current version at 42 U.S.C.A. § 408(a)(7)(C) (1991)).

entered a judgment of acquittal because the cards in her possession were not sufficiently complete to be considered counterfeit. We agree.

## I.

### Background

On March 24, 1989, a package sent from Brazil was examined during a routine customs inspection at Kennedy Airport in New York. The package was addressed to appellant. Inside the package was a gift-wrapped box; inside the box was a book; inside the book were approximately 500 bogus social security cards.

After some preliminary scouting, the authorities made a controlled delivery of the package at the specified Massachusetts address. Appellant answered the door, identified herself as the addressee, accepted the package, and signed for it. Government agents kept watch as appellant's husband discarded the empty package and, later, as appellant drove away in her automobile. At that point, appellant was stopped and arrested.

After the arrest, the agents moved to secure the premises. Upon entering the dwelling, they encountered appellant's husband. He led them to a closet and, in turn, to a box within the closet. The box contained what appeared to be the bogus social security cards that had been delivered earlier in the day. A search yielded a supplemental cache of fake cards. Prosecution followed. A jury found appellant guilty.

## II.

### Analysis

#### A.

### Standard of Review

■■■ In reviewing the denial of a motion to acquit, the court of appeals, like the district court, must scrutinize the record in the light most congenial to the government and draw all reasonable inferences in favor of the verdict. *United States v. Amparo*, 961 F.2d 288, 290 (1st Cir.1992); *United States v. Victoria–Peguero*, 920 F.2d 77,

86–87 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2053, 114 L.Ed.2d 458 (1991). If the total evidence, read in this light, is sufficient to allow a rational jury to find each of the elements of the offense beyond reasonable doubt, then the lower court's denial of the motion for acquittal will be upheld.

In this case, appellant concedes that a *rational jury could have found knowledge,* possession, and intent to distribute. More, however, was needed. In order to convict, the prosecution had to prove that the cards possessed by Gomes were "counterfeit social security card[s]" within the meaning of 42 U.S.C. § 408(g)(3). It is on this element of the offense that appellant makes her stand.

We turn, then, to the evidence anent the confiscated cards and, thereafter, to the highly nuanced meaning of the word "counterfeit" as used in statutes like section 408(g)(3).

#### B.

### The Evidence

The bogus social security cards were inscribed on both sides. A photocopy of a typical card (front and rear) is contained in the appendix. On its face, the card bore the heading "SOCIAL SECURITY" in large white letters. In red, centered, was what purported to be the Department of Health and Human Services (HHS) seal. The words "this number has been established for," printed in blue, ran horizontally across the seal. At the bottom of the card was a signature line, also printed in blue. The face of the card was white with light blue specks, except for (i) a dark blue border beneath the legend "SOCIAL SECURITY," (ii) a decorative blue-and-white pillar motif, and (iii) the textual references mentioned above. The reverse side of the card was white. The text contained thereon was printed in blue.

Testimony by an HHS agent established that the spurious cards differed from genuine social security cards in several obvious respects: they lacked printed nine-digit social security numbers, printed names, and

holders' signatures. In addition, the cards lacked four distinct safety features specially designed to foil counterfeiters: raised lettering for the heading; multicolored flecks in the paper; a line of micro-text in lieu of a conventional signature line; and a serial number. The expert testimony indicated that, while the absence of these safety features would, in all likelihood, not be noticed by an ordinary person, the absence of the holder's name, social security number, and signature would be readily apparent.

## C.

### The Legal Standard

In ordinary parlance, the word "counterfeit" is sometimes used to mean "not genuine." In more discerning circles, however, the word "counterfeit" is reserved for "an imitation or replica markedly close or faithful to an original." Webster's *Third New International Dictionary* 519 (1981). In the criminal law, the word has retained its literal meaning. *See, e.g., United States v. Smith,* 318 F.2d 94, 95 (4th Cir.1963) ("The very word connotes a similitude, without which there is no counterfeit."). Thus, a bogus document is counterfeit if it "is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." *United States v. Chodor,* 479 F.2d 661, 664 (1st Cir.) (citation omitted), *cert. denied,* 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); *accord United States v. Fera,* 616 F.2d 590, 598 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980). While *Chodor* and *Fera* both involved counterfeit currency, the same yardstick has routinely been applied to other documentary imitations. *See, e.g., United States v. Parnell,* 581 F.2d 1374, 1381 (10th Cir.1978) (applying identical standard to cashier's checks), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979); *United States v. Anderson,* 532 F.2d 1218, 1224 (9th Cir.) (similar; stock certificates), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976).

Although a bogus document cannot be considered a counterfeit unless it possesses enough verisimilitude to deceive an ordinary person, the law does not criminalize only masterpieces. Thus, to run afoul of the counterfeiting laws, a copy does not have to be an artistic triumph or so good an imitation as to baffle an expert. *See, e.g., United States v. Brunson,* 657 F.2d 110, 114 (7th Cir.1981) ("there is no requirement that the challenged products be paradigmatic likenesses of ... perfection"), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982); *Fera,* 616 F.2d at 598 (similar). By the same token, the copy need not be entirely complete. Even if it is unfinished, an ersatz document may still be considered a counterfeit if what remains to be done is inconsequential or insignificant. *See United States v. Moran,* 470 F.2d 742, 743 (1st Cir.1972) (per curiam) (fake currency that was "complete in every other respect" could be considered counterfeit despite the fact that the bills were in uncut sheets of six).

## D.

### The Law of the Case

In this instance, the court charged the jury that

> a counterfeit social security card ... is a card which resembles sufficiently a real card that it could deceive an honest intelligent person who was unsuspecting concerning it. So if we have a card which is made to resemble an actual social security card, one that can, in the state in which it is received, deceive an honest, sensible, unsuspecting person who has powers of ordinary observation and who exercises ordinary care in looking at things, if the card is sufficient to deceive a person of that type in the state in which it then exists, then it is a counterfeit social security card.... In its present condition, without a number on it and without a signature on it, does it sufficiently resemble a social security card ... so that it would deceive an honest, sensible, intelligent person un-

suspecting, one who is a person of ordinary observation and who exercises ordinary care?

In the court below, neither side objected to the instruction as rendered. Neither side asked the judge to instruct on some other or different theory. On appeal, neither side assigns error to the charge.

█ It is settled that, when a cause is submitted to the jury under an instruction, not patently incorrect or internally inconsistent, to which no timely objection has been lodged, the instruction becomes the law of the case. *See United States v. Angiulo*, 897 F.2d 1169, 1196 (1st Cir.), *cert. denied*, ––– U.S. –––, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Tapio*, 634 F.2d 1092, 1094 (8th Cir.1980) (per curiam); *see also Milone v. Moceri Family, Inc.*, 847 F.2d 35, 38–39 (1st Cir. 1988); *see generally* Fed.R.Crim.P. 30. That is the situation here.

### E.

#### *Sufficiency of the Evidence*

█ We come now to the critical question: was the evidence sufficient to support Gomes's conviction under the law of the case? We believe that this query must be answered in the negative.

The primary purpose of a social security card is to inform those who examine it that the bearer is eligible to work in the United States and that a nine-digit number has been established for the bearer to facilitate mandatory payments into the social security system and, eventually, withdrawals from the system. It follows ineluctably that the most salient elements of a social security card are the bearer's name and social security number. Here, the bogus cards bore neither names nor numbers. In the absence of these crucial indicia, we cannot conceive that, in the language of the

district court's charge, "an honest, sensible, unsuspecting person who has powers of ordinary observation and who exercises ordinary care in looking at things," could have believed the cards, in the condition in which they were confiscated, were genuine social security cards.[2]

This belief is buttressed by our recognition that the combined lack of a name, signature, and number is not simply the omission of an insignificant particular. While a missing serial number or seal may be easily overlooked on the face of a bogus piece of currency, *cf. Chodor*, 479 F.2d at 663 (holding it to be a jury question whether fake ten-dollar bills which resembled authentic bills in all respects except for missing serial numbers and seal were counterfeit), the absence of the name, signature, and nine-digit number on a social security card could hardly be overlooked. Without these insertions, a bogus social security card is lacking in several significant particulars—much like a counterfeit bill that omits the usual references, textual and numerical, to a specified denomination. In our opinion, a rational jury, exhibiting fidelity to the court's instructions, could not have found a sufficient resemblance between the largely unfinished simulation that Gomes possessed and the authentic prototype. *See, e.g., Moran*, 470 F.2d at 743 ("if the paper was unfinished *in any significant particular*, it was not yet a counterfeit") (emphasis supplied); *Smith*, 318 F.2d at 95 (defendant could not be prosecuted under 18 U.S.C. § 472 for possessing phony Federal Reserve notes which were "too crude to mislead").

This is not to say that Gomes deserved a Good Conduct medal. It is surpassingly difficult to imagine a legitimate reason for accumulating almost a thousand bogus social security cards. Our task, however, is

**2.** We note that the government adduced no evidence that the bogus cards actually deceived anyone or were ever accepted as genuine. We agree with the Ninth Circuit that such anecdotal evidence may bear directly "on the issue of the quality of the counterfeit, that is, whether [the bogus item] is in fact an imitation in resemblance of a genuine obligation of the United States." *United States v. Johnson*, 434 F.2d 827,

829 (9th Cir.1970); *accord United States v. Turner*, 586 F.2d 395, 398 (5th Cir.1978) (proof that bogus bills "successfully fooled" change machines that were "designed to accept only real dollar bills" was proof that the copies "had the requisite resemblance to real bills"), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979).

not to deal with the morality of Gomes's deportment but with the entirely separate matter of whether, in contemplation of law, her actions transgressed the statute under which she was charged.[3] Given both the facts and the law of the case, we are constrained to conclude that, whatever appellant may have done wrong, she could not legally be found guilty of violating 42 U.S.C. § 408(g)(3).

### F.

#### The Government's Afterthought Theory

At oral argument, the government urged us to evaluate the criminality of Gomes's conduct not under the law of the case but under a test utilized in *United States v. Moreno–Pulido,* 695 F.2d 1141 (9th Cir. 1983). In *Moreno–Pulido,* the Ninth Circuit took a functional approach to the question of whether a bogus "green card" could be deemed counterfeit, judging it by the standard of whether the card was "unalterably dedicated to use as a counterfeit." *Id.* at 1144. We requested supplemental briefs on this point. We have received and reviewed them.

Although *Moreno–Pulido* appears never to have been followed (or even cited) for its central proposition in any reported case, we recognize the practical wisdom of the Ninth Circuit's approach. Nevertheless, we need not decide whether we might subscribe to the proposition in a suitable situation.[4] Here, the court charged, and the jury convicted, on the *Chodor/Fera* standard—and it did so without a peep of protest on the government's part. On that standard, the evidence is insufficient to convict. And, the prosecution's belated embrace of a new approach cannot repristinate the record.

An appellate court may not lawfully sustain a conviction on a theory entirely different from the theory upon which the jury was charged. *See Chiarella v. United States,* 445 U.S. 222, 236, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); *Angiulo,* 897 F.2d at 1197; *United States v. Hill,* 835 F.2d 759, 764 n. 7 (10th Cir.1987). Thus, the government's afterthought cannot salvage the guilty verdict.

### III.

#### Conclusion

We need go no further.[5] It is not our province either to rewrite statutes enacted by Congress or to compensate for prosecutorial charging decisions gone awry. Criminal statutes must be construed as they are written and the guilt of an accused must be determined against the letter of the statute under which she is charged as elucidated by the law applicable to her case.

In the case at bar, these self-evident truths require that the conviction be reversed. The cards discovered in appellant's possession were in such a state of incompleteness that they could not plausibly have deceived "an honest, sensible, unsuspecting person," ordinarily observant and ordinarily intelligent. Thus, whatever appellant's ultimate intention, she could not be convicted of the crime with which she was charged and for which she was tried. Put bluntly, the cards found in Gomes's possession could not, as a matter of law, be considered counterfeit as that term was defined in the instructions given to the jury.

*Reversed.*

---

**3.** By way of example, we note that it might well have been more appropriate, and more profitable from the government's coign of vantage, to prosecute this defendant under 18 U.S.C. § 1028 (1988 & Supp. II 1990), which prohibits, *inter alia,* the possession "with intent to use unlawfully or transfer unlawfully five or more ... false identification documents." 18 U.S.C. § 1028(a)(3).

**4.** We take no view of whether adoption of the *Moreno–Pulido* standard would require congres-

sional action, given the judicial gloss that has been placed on the word "counterfeit" in a series of decisions spanning several decades.

**5.** In light of the disposition that we make of Gomes's appeal, we need not address her second assignment of error.

**1296**

## APPENDIX

Do not laminate this card.

This card is invalid if not signed by the number holder unless health or age prevents signature.

Improper use of this card and/or number by the number holder or any other person is punishable by fine, imprisonment or both.

This card is the property of the Social Security Administration and must be returned upon request. If found, return to:
   SSA-ATTN: FOUND SSN CARD
   P.O. Box 17087 Baltimore Md. 21203
Contact your local Social Security office for any other matter regarding this card

**Department of Health and Human Services**
Social Security Administration
Form OA-702 (4-84)

---

YOUNG, District Judge (dissenting).

The majority here reverses the appellant's conviction for possessing counterfeit social security cards with the intent to sell them in violation of 42 U.S.C. § 408(g)(3) (1988),[6] on the ground that the evidence was insufficient to convict. They reach this result in the face of a guilty verdict from a properly charged jury on evidence that the appellant knowingly possessed with the intent to sell five hundred blank but fake copies of social security cards, each accurate in every preprinted particular but none bearing a typed-in name or social security number. Believing that the majority has too easily equated counterfeit currency with counterfeit social security cards and, in the process, has *sub silentio* overruled this court's decision in *United States v. Moran*, 470 F.2d 742 (1st Cir. 1972), I am constrained respectfully to dissent.

---

**6.** The current version of the statute is codified    at 42 U.S.C. § 408(a)(7)(c) (1992).

## I. The Counterfeit Standard

The crux of the majority's view is expressed in the conclusion that, "[i]n the absence of these crucial indicia [the bearer's name and social security number], we cannot conceive that, in the language of the district court's charge, 'an honest, sensible, unsuspecting person who has powers of ordinary observation and who exercises ordinary care in looking at things,' could have believed the cards, in the condition in which they were confiscated, were genuine social security cards." Majority Opinion at 1294.

While this is the first decision of this Circuit to apply the *Chodor/Fera* standard to circumstances other than the counterfeit currency cases in which the standard was developed,[7] and while it may well be argued that this standard is inapposite in the context of blank social security cards, I agree completely with the majority that the *Chodor/Fera* standard has become the law of *this* case and the government is stuck with it here.

Even so, as the Ninth Circuit remarked in analogous circumstances, "completeness in a green card is a more complex issue than completeness in counterfeit currency." *United States v. Moreno–Pulido*, 695 F.2d 1141, 1144 (9th Cir.1983) (case involving counterfeit immigration "green cards").

> An item of currency enables a holder to receive value in exchange. A green card is more like a government check or a U.S. savings bond. Such certificates may need signatures, filled-in blanks or other steps before they can serve their purpose, but a counterfeited check or bond would appear to be a counterfeit before the required information and signatures are included.

*Id.*

Precisely the same distinction exists, of course, as between currency and a social security card. Currency is a medium of exchange, valuable in and of itself, each bill intended to be fungible and, but for the serial number and mint designation, each

pretty much like any other of the same denomination. Not so a social security card issued to a particular person. Such a card is, to carry out its essential purpose, specific to that person, and sets out the bearer's name and social security number. The pre-printed blank form, however, is a standard issue government document: Social Security Administration Form OA–702 (4–84) in this case. The production of the standard pre-printed form is, therefore, one governmental step and the issuance to a specific individual (with the name and social security number typed in) is another. Thus, prior to individualized issuance, genuine social security cards exist in blank form—a concept that is absurd in the context of currency. Who, after all, ever heard of a blank ten dollar bill? In currency cases, therefore, the accuracy of the replica in comparison to genuine bills is the crucial determinant. In the context of social security cards, however, what exists in blank form may be stolen—and, more importantly, it may be counterfeited.

Once this distinction is understood, it is not difficult to conceive of a wide variety of groups to whom such counterfeit blank social security cards might be retailed. Immigrants unfamiliar with our laws, young people applying for their first jobs, the elderly seeking a replacement card—each person is a mark for the unscrupulous individual seeking to market counterfeit blank social security cards. What is more, each one may well be an "honest, sensible, unsuspecting person who has powers of ordinary observation and who exercises ordinary care in looking at things." Such a victim's confusion lies not with the blank social security card which in all respects appears genuine, but rather, with the victim's understanding of the regulatory framework within which such cards are issued to individuals. Indeed, the very evil that these counterfeit blank social security cards pose is that an unscrupulous individual may market them to the innocent and guilty alike, all in subversion of the social security laws and regulations.

---

7. *See United States v. Chodor*, 479 F.2d 661 (1st Cir.), *cert. denied*, 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); *see also United States v.*

*Fera*, 616 F.2d 590 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

I agree with the Ninth Circuit that a person who manufactures or sells the blank form to another individual who fills in the card is guilty of counterfeiting. *See Moreno–Pulido,* 695 F.2d at 1144 n. 3. More to the point, I also believe that the appellant can, consistent with the instructions of the district judge here, be found guilty upon this common sense view of the evidence presented to the jury.

Furthermore, I agree with the majority that *United States v. Moran* establishes in this Circuit the benchmark propositions that "[e]ven if it is unfinished, an ersatz document may still be considered a counterfeit if what remains to be done is inconsequential or insignificant" but that "if the paper [is] unfinished in any significant particular, it [is] not yet a counterfeit." Majority Opinion at 1293, 1294, citing and quoting *Moran.*[8]

Where I part company with the majority is in discerning the practical application of *Moran* in the instant circumstances. *Moran,* after all, involved uncut sheets of bogus ten dollar bills. There is simply no functional difference between the uncut bills in *Moran* and the blank social security cards here. If *Moran* were good law, it would require affirmance here because it recognizes that the uncut sheets are counterfeit even though the bills could not, in uncut form, pass in commerce. The majority opinion, however, eviscerates *Moran* even while citing it. The paper confiscated in *Moran* would not meet the test of counterfeiting as applied by the majority here, since the uncut sheets of bogus ten dollar bills would not be accepted, for example, in the supermarket check-out line. Believing that this interpretation is too rigid in light of *Moran* and that it is not our province to overrule the decision of another panel of this Circuit, I cannot join in the majority's opinion.

## II. Probable Cause to Search

Given the approach that I advocate regarding the appellant's first contention, I am further obliged to address her second point. In light of the controlled delivery of a specific package, appellant criticizes the breadth of the search as it was ultimately authorized and executed. In my view, there was no error either in authorization or execution.

The government's supporting affidavit contained specific information beyond the mere circumstances of the controlled delivery. The affiant stated that a review of the Massachusetts Registry of Motor Vehicles' records indicated that the appellant had used a fraudulent social security number on her application for a Massachusetts driver's license. Based on information in that affidavit, therefore, there was probable cause to issue the particularized search warrant which allowed the government to seize items and documents which identified the appellant as Nazira Gomes. Gomes' name and fraudulent social security number appeared on the application obtained from the Massachusetts Registry of Motor Vehicles and also on the package of contraband mailed to 29 Hayes Street. *See, e.g., United States v. Rey,* 923 F.2d 1217, 1220–21 (6th Cir.1991) (probable cause existed to issue an anticipatory search warrant relating to a controlled delivery); *United States v. Malik,* 680 F.2d 1162, 1165 (7th Cir.1982) (defendants' claim that search warrant issued after controlled delivery was too broad has no merit if warrant is specific and detailed).

Concluding that, on this record, denial of the motion to suppress was proper and that the evidence was sufficient to support the conviction, I would affirm. Since my views have proved unpersuasive to the majority, I respectfully dissent.

---

**8.** I recognize, of course, that the year after our decision in *Moran* we decided in *Chodor* that "[t]he proper test for determining what constitutes a counterfeit obligation is, as stated in *United States v. Lustig,* 159 F.2d 798, 802 (3d Cir.1947), *rev'd on other grounds,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949)." *Chodor,* 479 F.2d at 664. In the instant case, the district judge instructed the jury in accordance with the *Chodor* standard.